UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 20-CV-02532-ECT-DTS

_____

MARIO FERBO MANCINI,

                Plaintiff,

     v.

UNITED STATES OF AMERICA,
et al.,

                Defendants.

_____


**REPLY MEMORANDUM IN SUPPORT OF THE UNITED STATES'
MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE
EXPERT TESTIMONY**

## INTRODUCTION

Plaintiff's expert failed to identify specific facts showing the standard of care, its breach, or causation in this medical malpractice case. Dr. Wyard's affidavit mistakes some facts while ignoring others, asserts only broad and conclusory statements, and fails to consider obvious alternative causes for Plaintiff's injuries. Plaintiff's expert disclosure therefore falls short of the requirements of Minnesota substantive law and the federal rules of evidence. The Court should grant summary judgment and dismiss Plaintiff's claim with prejudice.

## CORRECTING THE FACTUAL RECORD

Like Dr. Wyard's affidavit itself, Plaintiff's opposition brief asserts as fact statements that are wholly unsupported—and indeed contradicted—by the records in this case. The United States will not repeat the genuinely undisputed facts, but several of Plaintiff's misstatements call out for correction.

Plaintiff first misstates the facts by asserting he "report[ed] that he was experiencing pain, numbness and weakness in his right arm" on July 2. Pl.'s Br. at 2 (citing Mosedale Decl. ¶ 4, Ex. B). Exhibit B to counsel's affidavit is an email from Nurse Ferrel Nelson, reporting Plaintiff appeared on that date with "[i]ncreasing right shoulder pain that is causing his hand to be numb," without mentioning weakness. ECF No. 185-1 at 6. Neither the record from that

encounter nor any other record shows evidence of weakness until July 20. Torgerson Decl. Ex. 2, ECF No. 178-2 at 67. But it is not just a lack of evidence that Plaintiff reported this supposed weakness—the evidence affirmatively shows he had normal strength. The undisputed facts show Mancini had "good strength" in his "hands and fingers bilaterally" on July 1. *Id.* at 70. And on July 5, PA Southwick noted Mancini's "[g]rip strength [is] equal and normal." *Id.* at 60. Plaintiff's assertion he suffered weakness before July 20 is belied by the record.

Plaintiff speculates his expert meant to say "[w]eakness . . . is often mistaken for numbness," citing a Mayo Clinic website. Pl.'s Br. at 17 n.1. Dr. Wyard did not express this opinion, and an unattributed statement from a non-party's website is no substitute for expert testimony. The record does not support this supposed fact, and the Court should disregard it.

Plaintiff takes additional liberties with the record. He states, "Dr. Mayer, alarmed by the rate at which Plaintiff was losing strength in his right arm, ordered an urgent MRI to be performed on Plaintiff" on July 20. Pl.'s Br. at 2 (citing Mosedale Decl. Ex. C). Then, without citing any portion of the record, he concludes, "FCI Sandstone did not act promptly on the order." *Id.*

This is false. Dr. Harvey approved the MRI the same day Dr. Mayer ordered it. USA Dep. Ex. 7, ECF No. 177-3 at 101. There is no record evidence that prison officials delayed approving or scheduling the MRI.

3

Plaintiff also repeats the myth that he suffered "spinal cord compression," citing his August 7 MRI results. Pl.'s Br. at 2. Those MRI results confirm that Plaintiff suffered "*no* cord compression." Torgerson Decl. Ex. 9, ECF No. 178-9 at 2 (emphasis added). The only suggestion of spinal cord compression is Dr. Wyard's mistaken assertion, again citing the August 7 MRI results, that "Plaintiff's MRI showed . . . spinal cord compression." But this falsehood does not create a dispute of fact. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 ("when indisputable record facts contradict or otherwise render the [expert's] opinion unreasonable, it cannot support a jury's verdict"). Plaintiff did not suffer spinal cord compression, as the record indisputably shows. Dr. Wyard's baffling claim that the MRI showed cord compression is unreasonable and unsupported.

Finally, Plaintiff repeatedly relays inadmissible and contradictory opinions from a nontestifying witness, Dr. Broadway, to suggest his care was delayed. *E.g.*, Pl.'s Br. at 3, 4, 10, 11, 12, 13, 14, 17, 18. He insists Dr. Broadway "urg[ed]" prison officials to schedule Plaintiff's surgery sooner, and that the surgery needed to occur "as soon as possible," "immediate[ly]," or "within a short period of time." *Id.* at 3, 4, 11. These statements do not appear in the record. In fact, Dr. Broadway himself recommended surgery take place within 60 days after his September 1 neurosurgery consult report. Torgerson Decl. Ex.

4

7, ECF No. 178-7 at 3. It is undisputed that prison officials originally scheduled the surgery to occur on October 18—47 days later.

True, this surgery did not occur until November 27—90 days after Dr. Broadway's recommendation. Plaintiff the ignores the undisputed evidence that Dr. Harvey approved Plaintiff's surgery to occur within "90 days or first available." Torgerson Decl. Ex. 18, ECF No. 178-18. Dr. Wyard does not explain his opinion that the surgery needed to occur sooner than this. Instead, Plaintiff relies exclusively on hearsay attributed to Dr. Broadway. But without any analysis of his own, Dr. Wyard's affidavit fails to satisfy the requirements for expert testimony.

## ARGUMENT

### I.   Plaintiff cannot show his expert-disclosure affidavit complies with Minn. Stat. § 145.682.

Minnesota's expert-disclosure affidavit requirement is more than a mere formality. The law requires a plaintiff's expert to explain "the *substance* of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion." Minn. Stat. § 145.682, subd. 4(a). The affidavit must contain "specific details concerning their experts' expected testimony." *Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 193 (Minn. 1990). "[G]eneral statements . . . are not sufficient to satisfy the strict standard for expert affidavits." *Maudsley v. Pederson*, 676 N.W.2d 8, 14 (Minn. Ct. App.

2004). Without the specifics required by Minnesota law, the Court must dismiss Plaintiff's medical malpractice action.

### A. Dr. Wyard's affidavit fails to "disclose specific details" about the standard of care and its breach.

Dr. Wyard did not disclose any details supporting his opinion that a one- or two-day surgical timeline constitutes the standard of care in this case. It is undisputed that Plaintiff underwent ACDF surgery within the 90-day timeline approved by Dr. Harvey. Torgerson Decl. Ex. 18, ECF No. 178-18. Dr. Wyard did not "disclose specific details" explaining why that surgical timeline was not "timely and appropriate" under the circumstances. His affidavit therefore fails to establish the standard of care or its breach.

Dr. Wyard's affidavit is limited to "his opinion that the standard of care required that the Plaintiff receive timely and appropriate treatment." Pl.'s Br. at 8. Beyond these generalities, Plaintiff construes three supposed standards of care in Dr. Wyard's affidavit: (1) "providing the necessary medical procedures in the appropriate period of time"; (2) "not causing undue delay for an ACDF surgery when the patient is exhibiting worsening symptoms"; and (3) putting the patient "on NPO (nothing by mouth) status twelve hours before surgery." Pl.'s Br. at 9. These are not the detailed standards of care required by Minn. Stat. § 145.682.

A standard of care requires more than saying a health care provider must treat a patient in the "appropriate amount of time" or avoid "undue delay." Dr. Wyard must explain *what* the appropriate amount of time is and *why* a reasonable provider under these circumstances would know it is the appropriate amount of time for Mancini's surgery. *Anderson v. Rengachary*, 608 N.W.2d 843, 848 (Minn. 2000).

This requirement comes directly from the Minnesota Supreme Court. In *Anderson*, the plaintiff underwent an ACDF procedure resulting in "a severed vagus nerve and swelling of her esophagus and thyroid." *Id.* at 844–45. The plaintiff's expert stated, "The standard of care is that esophageal trauma should be avoided during surgery of this type." *Id.* at 845. The supreme court affirmed dismissal, holding the expert's affidavit must "state what particular measures a physician should take to avoid" the injury. *Id.* at 848. That is because Minnesota law requires more than proving a provider's treatment was unsuccessful. *Klisch v. Meritcare Med. Grp., Inc.*, 134 F.3d 1356, 1359 (8th Cir. 1998). The plaintiff must instead show the doctor failed to provide reasonable care under the circumstances known or reasonably available to them at the time. *Id.* at 1360 (citing *Oulelette v. Subak*, 391 N.W.2d 810, 816 (Minn. 1986)).

But without explaining what a reasonable provider would have done differently, the plaintiff cannot establish the standard of care.

Dr. Wyard's standard of care fails to show how a reasonable provider would have known Plaintiff needed more urgent surgery. He stated only that Plaintiff required treatment in the appropriate amount of time, and that FCI Sandstone officials should have avoided undue delay. Pl.'s Br. at 9. By stating the standard of care in these broad terms, Dr. Wyard's affidavit, like the expert affidavit in *Anderson*, provides no insight into how a reasonable provider should have handled this case. What indicators do reasonable providers look for under these circumstances? What physical exams do they conduct? What do reasonably skilled medical professionals recommend? Without these details, Dr. Wyard's affidavit offers nothing more than post-hoc judgment.

The hearsay statement attributed to Dr. Broadway cannot supply the standard of care. Plaintiff's argument relies on Mancini's testimony that Dr. Broadway told him, "[I]f it was up to me [the surgery] would be in a day or two." Draisey Decl. Ex. 5, ECF No. 177-5 at 79:24–25. Then, without any citation to the record, Plaintiff asserts he relayed this statement to FCI Sandstone officials. Pl.'s Br. at 11. Plaintiff then infers that this timeline—not

Dr. Harvey's 90-day timeline—forms the standard of care. But he does not explain why.

Dr. Wyard cannot simply repeat the hearsay statement of a nontestifying doctor and call it a standard of care. Without Dr. Broadway's testimony, his out-of-court statement lacks necessary foundation to be admissible expert opinion testimony under Rule 702. And it is inadmissible through Dr. Wyard under Rule 703. *United States v. Grey Bear*, 883 F.2d 1382, 1392–93 (8th Cir. 1989) ("Fed. R. Evid. 703 does not permit an expert witness to circumvent the rules of hearsay by testifying that other experts, not present in the courtroom, corroborate his views."). Instead, he must assess the validity, methodology, reasoning, and factual basis the nontestifying expert relied on. *In re ResCap Liquidating Tr. Litig.*, 432 F.Supp.3d 902, 932 (D. Minn. 2020) (excluding experts because they "are not permitted to simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon."); *see also Brennan v. Reinhart Institutional Foods*, 211 F.3d 449, 451 (8th Cir. 2000) (medical records admitted under Rule 703 are "inadmissible as substantive evidence to prove the truth of the fact asserted"). Dr. Wyard's affidavit does not meet this standard.

Dr. Wyard described no independent basis explaining why Dr. Broadway's hearsay statements represent the standard of care. He does not show that a reasonably skilled provider under the circumstances would have

countermanded Dr. Harvey's timeline and ensured the surgery occurred sooner. The affidavit therefore fails to disclose specific details explaining his opinion that the surgery should have occurred sooner than 90 days. By seeking to impose a standard of care based only on Dr. Broadway's hearsay statements, Dr. Wyard serves as a mere "conduit of inadmissible hearsay, in violation of the rules of evidence." *In re ResCap Liquidating Tr. Litig.*, 432 F.Supp.3d at 932.

Plaintiff also construes an unstated standard of care from Dr. Wyard's affidavit. He contends "the standard of care is to ensure that a patient receives their necessary procedure consistent with the recommendations of a specialist." Pl.'s Br. at 12. Plaintiff cites Paragraphs 5, 10, 11, 12, and 14 of Dr. Wyard's affidavit, but none includes this opinion. Paragraphs 5 and 10 assert that the standard of care required treatment in "the appropriate amount of time," or "as soon as possible." Draisey Decl. Ex. 4, ECF No. 177-4 ¶¶ 5, 10. Paragraphs 11 and 12 relate to putting Plaintiff on NPO status. *Id.* ¶¶ 11–12. And paragraph 14 concludes, "This string of delays resulted in Plaintiff's symptoms worsening" during the alleged delay. *Id.* ¶ 14. The Court should not permit Plaintiff to spin a new expert opinion from these threads.

Even if the affidavit included this opinion, Dr. Wyard and Plaintiff both ignore the undisputed fact that Dr. Harvey approved the surgery to occur within 90 days. The standard of care cannot be that midlevel providers were

required to ignore their supervising physician's timeline and insist on a more aggressive one. If the standard of care truly required nurses and physician's assistants to countermand doctor's orders, Dr. Wyard should say so.

## B. Dr. Wyard's conclusory causation opinion cannot overcome summary judgment.

Dr. Wyard did not explain "how and why" the supposed "string of delays" caused Plaintiff's injuries. An expert cannot "simply repeat the facts in the hospital or clinic record" but must explain how he used those facts to arrive at his opinions. *Stroud v. Hennepin County Med. Ctr.*, 556 N.W.2d 552, 555 (Minn. 1996). Minnesota law on causation requires more than showing a standard of care was breached followed by the patient's worsening condition. *Leubner v. Sterner*, 493 N.W.2d 119, 122 (Minn. 1992). Otherwise, "expert testimony on causation would not be necessary." *Id.*

Dr. Wyard did not explain how he concluded a delay in surgery caused Plaintiff's injuries. It is undisputed that imaging shows Plaintiff's chronic condition in August 2017 had changed "very little" since March 2010. Trobiani Decl. Ex. A, ECF No. 179-1 at 30. Dr. Wyard did not dispute this fact or even discuss the imaging results in his affidavit. For a delay to have caused Plaintiff's injuries, there must have been some change during the supposed delay that would have been prevented by earlier surgery. Dr. Wyard does not identify any evidence of worsening nerve compression during the alleged delay.

11

And it is undisputed that June 2019 imaging shows Plaintiff's surgery successfully decompressed his nerve. *Id.* at 32. Dr. Wyard again fails to explain how nerve compression during the supposed delay caused new symptoms, like atrophy and fasciculations, only after surgery successfully decompressed the nerve. Without facts specific to this case, the affidavit fails to meet the causation requirement.

Plaintiff insists "Dr. Wyard does state facts specific to this case," citing Paragraphs 9, 10, and 13 of the doctor's affidavit. Pl.'s Br. at 13; *see also* Draisey Decl. Ex. 4, ECF No. 177-4 at ¶¶ 9, 10, 13. Those paragraphs merely "repeat the facts in the hospital or clinical record." *See Stroud*, 556 N.W.2d at 555 (affirming summary judgment for insufficient causation opinion). Plaintiff then points to Paragraphs 14 and 15, which conclude, without explanation, "delays resulted in Plaintiff's symptoms worsening" and permanent injury occurred "as a result of Defendant's deviations." Draisey Decl. Ex. 4, ECF No. 177-4 at ¶¶ 14-15. Case after case from Minnesota's appellate courts have held conclusory causation opinions like these do not pass muster.

Compare Dr. Wyard's testimony to the insufficient causation opinion in *Hanson v. McNiff*, No. A10-941, 2011 WL 134970 (Minn. Ct. App. Jan. 18, 2011). In that case, the plaintiff sued her neurologist, Dr. Hubbard, after she suffered a serious form of nerve compression in her lumbar spine called *cauda equina* syndrome. *Id.* at *1. Like Dr. Wyard, the plaintiff's expert in *Hanson*

12

stated, "decompression of the nerves . . . must be accomplished as soon as possible." *Id.* As to causation, the expert wrote, "[i]f Dr. Hubbard had exercised reasonable care on June 13 in obtaining the MRI of the spine and then referring [the plaintiff] to [the neurosurgeon] as soon as the results of the MRI were known, the surgery . . . would have been performed on June 13 instead of late in the night of June 14." *Id.* This, the expert claimed, would have prevented "further damage to the nerves that occurred between the time surgery [c]ould have been performed . . . [and when] it was actually performed." *Id.* The court of appeals held this causation opinion failed to meet the requirements of section 145.682. *Id.* at *4. The court compared the expert's opinions to those offered in *Maudsley* and *Demgen v. Fairview Hospital*, 621 N.W.2d 259, 268 (Minn. Ct. App. 2001). Like in *Maudsley*, the expert in *Hanson* identified only "a nebulous timeframe in which [the expert] asserts that Dr. Hubbard's delay caused [the plaintiff's] long-term injuries." *Id.* Without positing a specific timeline, the expert's testimony failed to show that "earlier" surgery would have prevented the plaintiff's injuries. *Id.*

The Court should do the same here. Dr. Wyard does not show how Plaintiff's injuries occurred during the supposed delay. He merely concluded, without explanation, that the alleged "delays resulted in Plaintiff's symptoms worsening" and permanent injury. Draisey Decl. Ex. 4, ECF No. 177-4 at ¶¶ 14-15. This is not enough to comply with section 145.682.

**C.    The Court should not allow Plaintiff more time to again supplement his deficient expert disclosure.**

The statute is clear: failing to comply with the expert-disclosure requirements "results, upon motion, in mandatory dismissal with prejudice." Minn. Stat. § 145.682, subd. 6(c). This is not a question of federal procedural rules—it is an outcome determinative command in substantive state law. *See Morrow v. United States*, 47 F.4th 700, 704 (8th Cir. 2022) (applying Iowa's certificate-of-merit statute requiring dismissal "with prejudice" and affirming denial of plaintiff's motion for dismissal with*out* prejudice under Fed. R. Civ. P 41). Plaintiff has twice attempted to comply with the statute, and the time for disclosing expert opinions has passed. Although dismissal is a "harsh result[] in some cases," section 145.682 "cuts with a sharp but clean edge." *Lindberg v. Health Partners, Inc.*, 599 N.W.2d 572, 578 (Minn. 1999). The Court should not second guess the Minnesota legislature's decision.

Despite the legislature's clear directive and this Court's scheduling order, Plaintiff suggests the Court could order the United States to take and pay for a deposition to discover the specific details underlying Dr. Wyard's opinion. Pl.'s Br. at 14-15. Under both Minnesota substantive law and federal procedural rules, Plaintiff was required to come forward with expert testimony without awaiting a request. Minn. Stat. § 145.682; Fed. R. Civ. 26(b)(2)(B)(i). The Court should not invert that requirement by ordering the United States to

take and pay for a deposition to discover information it is entitled to without request.

## II.    The opinions in the expert-disclosure affidavit are inadmissible.

Dr. Wyard's conclusory opinions are so unsupported and blatantly contradicted by the record that exclusion is the only remedy. He mistakes basic facts, fails to discuss Plaintiff's medical history, lacks the qualifications to say what midlevel providers should do, and omits any consideration of alternative possible causes. The United States will not repeat all these arguments already discussed at length in its opening brief. Instead, we will focus on Dr. Wyard's failure to consider obvious alternative causes, like the known risks of ACDF surgery.

Dr. Wyard did not consider or rule out intraoperative nerve injury, an obvious alternative cause. To show causation under Minnesota law, an expert's "[t]estimony must show that it was more likely that the injury occurred from defendant's negligence *than from anything else.*" *Walton v. Jones*, 286 N.W.2d 710, 714–15 (Minn. 1979) (emphasis added); *see also McDonough v. Allina Health Sys.*, 685 N.W.2d 688, 695 (Minn. Ct. App. 2004) (affirming exclusion of plaintiff's expert who "did not rule out all other hypotheses, or at least explain why the other conceivable causes are excludable" as insufficiently reliable). "[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole

cause, a district court is justified in excluding the expert's testimony." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001). The Eighth Circuit recognized this rule in *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 694 (8th Cir. 2001), stating that an expert must "discount[] obvious alternatives" or explain "why other conceivable causes are excludable." Although the *Lauzon* court warned against taking this rule to a "quixotic extreme," *id.* at 693, this case closely resembles those in which courts have excluded testimony for failing to rule out obvious causes.

Dr. Wyard's failing to rule out intraoperative nerve damage is like the excluded expert's opinion in *Cooper*, 259 F.3d 194. In that device-defect case, the plaintiff's expert asserted the defendant's pedicle screws failed to successfully join the plaintiff's vertebrae after a spinal fusion, causing her post-surgery injuries. *Id.* at 196. The plaintiff's expert orthopedic surgeon explained his opinion that the pedicle screws caused a "nonunion" in the plaintiff's vertebrae. *Id.* at 201. The defendant's "experts provided several alternative explanations for the nonunion," like the plaintiff's history of smoking. *Id.* at 202. Yet, the plaintiff's expert did not consider the evidence showing this smoking habit and instead "summarily reject[ed]" the literature establishing this plausible alternative cause. *Id.* The Fourth Circuit agreed with the district court, holding the expert's failure to "identify specifically how he ruled out

smoking and other potential causes of the nonunion . . . renders his causation opinion little more than speculation." *Id.* at 202–03. Here, too.

Intraoperative nerve injury is a plausible, and indeed obvious, alternative cause of Plaintiff's injuries. It is undisputed that nerve damage is a known risk of ACDF surgery. Trobiani Decl. Ex. A, ECF No. 179-1 at 32. It is undisputed that Dr. Broadway discussed this risk with Plaintiff before the surgery. Torgerson Decl. Ex. 7, ECF No. 178-7 at 3. Dr. Wyard must account for this obvious alternative to reliably testify "that it was more likely that the injury occurred from defendant's negligence than from anything else." *Walton*, 286 N.W.2d at 714–15; *McDonough*, 685 N.W.2d at 695.

Plaintiff contends that Dr. Wyard and Dr. Trobiani merely "c[a]me to a different conclusion on causation." Pl.'s Br. at 13. But Dr. Wyard did not reach any conclusion on other causes—he did not consider them. Like the expert opinion in *Cooper*, Dr. Wyard's causation opinion "utterly fails to consider" known alternative causes for injuries like this, "render[ing] his causation opinion little more than speculation." *Cooper*, 259 F.3d at 202–03. Because Dr. Wyard failed to consider the known surgical risks as an obvious alternative cause, his opinion cannot reliably establish causation under Minnesota law.

## CONCLUSION

Because Plaintiff's expert-disclosure affidavit fails to comply with Minn. Stat. § 145.682 and Fed. R. Evid. 702, the Court should grant summary judgment for the United States and dismiss Plaintiff's claim with prejudice.

Dated:  August 28, 2023                    Respectfully submitted,

ANDREW M. LUGER
United States Attorney

*s/ Lucas B. Draisey*

BY:  DAVID W. FULLER
Assistant U.S. Attorney
Attorney ID Number 390922

LUCAS B. DRAISEY
Assistant U.S. Attorney
Attorney ID Number 0401625
600 United States Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Phone:  612-664-5600
Email: David.Fuller@usdoj.gov
Email: Lucas.Draisey@usdoj.gov