UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Mario Ferbo Mancini<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br><br>United States of America,<br><br>　　　　　　　　Defendant. | Case No. 20-cv-02532 -ECT-DTS<br><br><br><br>**PLAINTIFF'S OBJECTIONS TO THE NOVEMBER 17, 2023 REPORT AND RECOMMENDATION** |

## INTRODUCTION

Pursuant to Local Rule 72.2(b), Plaintiff objects to and seeks review of the November 17, 2023 Report and Recommendation. (Dkt. 189). Plaintiff respectfully requests that the Court set aside the Report and Recommendation and deny Defendant's Motion for Summary Judgment. (Dkt. 181).

## PROCEDURAL HISTORY

Plaintiff initiated this lawsuit *pro se* against Defendant and several other entities on December 14, 2020, alleging state law medical malpractice under the Federal Tort Claims Act ("FTCA") and constitutional violations under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). (Dkt. 1). The Court dismissed all claims except the FTCA claim against Defendant. (Dkt. 66; Dkt. 68).

1

Discovery commenced on March 28, 2022, after the Court issued the initial Pretrial Scheduling Order. (Dkt. 74). Plaintiff served an initial expert-disclosure of Dr. Tanzid Shams, M.D. on July 20, 2022, in compliance with Minnesota Statute § 145.682, while still a *pro se* plaintiff.

Eventually.. Plaintiff was referred to his current counsel via the *Pro Se* Project on November 7, 2022. Plaintiff's Counsel unsuccessfully attempted to contact Dr. Shams numerous times. On January 13, 2023, Defendant filed a motion for summary judgment on the basis that Dr. Sham's affidavit was legally deficient (Dkt. 155), but withdrew this motion when Plaintiff retained a new expert and a corresponding affidavit from Dr. Gary Wyard pursuant to Minn. Stat. § 145.682.  Defendant moved for summary judgment on July 24, 2023. (Dkt. 181). Magistrate Judge Schultz heard arguments on this motion on September 7, 2023, and issued his Report and Recommendation that recommends granting Defendant's motion on November 17, 2023. (Dkt. 189).

## FACTUAL HISTORY

Plaintiff Mario Ferbo Mancini ("Plaintiff") is an inmate at the Federal Correctional Institution in Sandstone, Minnesota ("FCI Sandstone"). (Dkt. 1 at 3). Plaintiff alleges that he suffered permanent damage to his right arm and hand because of the lack of, delayed and faulty medical care he received while under the care of FCI Sandstone, and in particular, the delay in providing Plaintiff necessary surgery after he suffered a neck injury. (*Id.* at 6).

Plaintiff first alerted FCI Sandstone to his injury when he reported it to a Health Services nurse, Ferrel Nelson, on July 1, 2017. (Dkt. 185 at Exh. A (USA_002556)).

Plaintiff was told he could not be seen until after the holiday weekend. (*Id.*). The next day, Plaintiff returned to Health Services, reporting that he was experiencing pain, numbness, and weakness in his right arm. (*Id.* at Exh. B (USA_004777)). Plaintiff was again told he could not be seen until after the holiday weekend. (*Id.*). On July 5, 2017, Physician Assistant Jenefer Southwick and Doctor Thomas Mayer each administered a strength test to Plaintiff's right arm; Plaintiff again reported his increasing pain and numbness. (*Id.* at Exh. C (USA_000958)). Dr. Mayer, alarmed by the rate at which Plaintiff was losing strength in his right arm, ordered an urgent MRI to be performed on Plaintiff. (*Id.*). FCI Sandstone failed to act promptly on the order. Instead, on August 7, 2017—seventeen days after Dr. Mayer ordered an "urgent" MRI—FCI Sandstone finally performed the MRI; Plaintiff was told his injuries were nonemergent (i.e. not an emergency), and that it may be a four months before he was seen by a neurosurgeon. (*Id.* at Exh. D (USA_000966); *see also id.* at Exh. E (USA_003541)). During this interim period without treatment, Plaintiff continued to experience excruciating daily pain, and an increasing loss of strength and numbness in his right arm and hand. (*See* Dkt. 184 at 3; *see also* Deposition of Mario Mancini ("Mancini Depo") at 81:2 ("I just wanted the pain to go away.").

On August 19, 2017, Plaintiff again returned to Health Services to report extreme pain and seek relief; he was given a shot of Torodol and referred to treatment by the psychology department after Health Services staff implied his issues were mental rather than physical. (*Id.* at 73:16-74:20). When Plaintiff expressed frustration that it seemed as

3

though Health Services staff was not taking his pain level seriously, Plaintiff was subsequently confined to his housing unit. (*Id.*).

On August 29, 2017, Plaintiff was finally seen by neurosurgeon Dr. Jarod Broadway at Essentia Health. Although Plaintiff was told on August 7 that his injuries were "nonemergent", Dr. Broadway concluded that Plaintiff needed an Anterior Cervical Discectomy and Fusion ("ACDF") surgical procedure as soon as possible to avoid permanent damage to his arm and hand. (*Id.* at 79:23-80:1). Despite the urging of Dr. Broadway, Plaintiff's ACDF was not scheduled until October 18, 2017, at which point Plaintiff was admitted to St. Mary's Medical Center in Duluth. (*See* Def's Supplemental Responses to Plaintiff's Requests for Admissions). Plaintiff did not receive his surgery on that scheduled date. Instead, he was sent back to FCI Sandstone because Health Services had failed to isolate him the night prior to ensure he did not eat twelve hours before his surgery—starkly in violation of Health Services' standard procedure. (*Id; see also* 30(b)(6) Deposition of Jessica Torgerson ("30(b)(6) Depo") at 35:23-36:2 ("Q. So generally would it have been considered against policy if...an inmate were placed on NPO status and were not placed in SHU? A. Yes.")).

As a result of this failure by prison staff, Plaintiff's surgery had to be rescheduled and Plaintiff did not receive the ACDF until November 27, 2017—ninety days after Dr. Broadway recommended immediate surgery. (*See* Deposition of Jenefer Southwick, P.A. ("Southwick Depo") at 76:9-14 ("Q. So Mr. Mancini received his surgery roughly 90 days after Dr. Broadway recommended he receive it within 60, correct? A. Correct."); *see also* Mancini Depo at 79:23-80:1 ("I asked [Dr. Broadway] when I was going to have

4

surgery. He said, quote, if it was up to me if would be in a day or two but scheduling is up to the BOP.")).

Though FCI Sandstone Health Services employs multiple medical staff members, only the Clinical Director is responsible for making final decisions regarding inmate care and for ensuring that standards of care are met. (30(b)(6) Depo at 25:14-26:1). The Clinical Director's decisions may be reviewed, if necessary, by their immediate supervisor, the Regional Medical Director. (*Id.* at 26:2-10). The only individual overseeing the Regional Medical Directors is the Medical Director of the Bureau of Prisons. (*Id.*).

At all times relevant to Mr. Mancini's claim, the Clinical Director of FCI Sandstone Health Services was Dr. Paul Harvey. (*Id.* at 52:22-24). Typically, FCI Sandstone houses approximately 1200 inmates. (*Id.* at 64:11-13). Dr. Harvey was therefore directly responsible for overseeing the care of and deciding treatment plans for over one thousand inmates at a time. In 2017, Dr. Harvey was also serving as the Regional Medical Director. (*Id.* at 63:22-64:1). As such, Dr. Harvey was effectively acting as his own supervisor, as well as supervising roughly twenty other Clinical Directors—each of whom were solely responsible for overseeing the care of hundreds (or thousands) of inmates, respectively. (*Id.* at 65:21-66:10).

Despite ostensibly being responsible for "approving and overseeing" Mr. Mancini's pre- and post-operative care, Dr. Harvey never examined (or even met) Mr. Mancini. (Southwick Depo. at 43:25-44:4). Indeed, Dr. Harvey was living in Michigan during the entirety of his time acting as the Clinical Director of FCI Sandstone Health

Service; he never examined the inmate patients he was treating, and only visited the facility "once or twice". (*Id.* at 43:9-18). The only medical staff with the authority to review Dr. Harvey's treatment plans was the Bureau of Prisons Medical Director, who was responsible for overseeing all healthcare within the entire Bureau. (*See* 30(b)(6) Depo at 65:5-12 ("Q. Is there just one bureau manager...for the entire prison system? A. Yes. Q. So the only person supervising Dr. Harvey at this time would have been the one bureau prison manager? A. The medical director, yep.")).

As a result of Defendant's actions, Plaintiff suffers permanent nerve damage, loss of strength, muscle atrophy, numbness, and considerable daily pain in his right shoulder, neck, tricep, forearm, hand, and finger.

## OBJECTIONS

Consistent with the Local Rule, this memorandum is an adjunct to the briefing on Defendant's motion for summary judgment, which detail Plaintiff's objections to the analysis and outcome recommended by the Magistrate Judge. *See* L.R. 72.2(b)(3) & Advisory Committee Note. Plaintiff respectfully seeks de novo review by the District Judge of the following objections:

I.  **Plaintiff Objects to the Report & Recommendation to the Extent that its Findings are Based on a Factual Record that Draws Inferences in Defendant's Favor.**

As the Court knows well, at summary judgment, any inferences must be construed in the non-moving party's favor. *See Pitman Farms v. Kuehl Poultry, LLC,* 48 F.4th 866, 875 (8th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)); *see also Bonomo v. Boeing Co.*, 63 F.4th 736, 745 (8th Cir. 2023) ("Evaluation of a

summary-judgment motion requires assessing the proffered evidence in the light most favorable to the non-moving party."). Here, the Report and Recommendation seems to adopt, in their entirety, the Defendant's recitation of the facts. This is inappropriate under the governing standard and requires review and warrants a different outcome without more.

The Report and Recommendation omits a number of facts material to the record.[1] For example, it does not note that Mr. Mancini was experiencing constant and increasing daily pain as he waited to receive an MRI and, subsequently, his surgery. (*See* Dkt. 184 at 3; *see also* Mancini Depo at 81:2 ("I just wanted the pain to go away."); *see also* USA_000437 ("The pain in my neck is getting to the point that I can not deal with it anymore…I am losing strength in my right arm. I can't hold on any more.")). Nor does the Report and Recommendation mention that in response to his consistent complaints of pain, Mr. Mancini was referred to the psychology department of Health Services after staff implied his suffering was mental rather than physical. (Dkt. 184 at 3). The Report and Recommendation similarly omits that FCI Sandstone's Clinical Director—Dr. Paul Harvey, who was responsible for approving and overseeing Mr. Mancini's pre- and post-operative care as well as ensuring that standards of care are met—never examined or even met Plaintiff. (Dkt. 184 at 5).

---

[1] Interestingly, the Report and Recommendation also includes several facts that are irrelevant to the issue at hand including the previous, similar injuries the Plaintiff had experienced and does not dispute – but also does not contend had any impact on the inappropriate treatment he received. These facts were included in Defendant's briefing for no clear reason. *Compare, e.g.* Doc. 189 at 2 with Doc. 176 at 5-6.

These facts are material to this action as they illustrate the number of opportunities Health Services staff had to act promptly in ensuring that Plaintiff received his surgery in a timely manner. "Simply because the failure to act was not immediately catastrophic" does not mean that action should not have been taken after each instance of increasing pain and numbness, and each instance in which Mr. Mancini's surgery was delayed due to the failure of Health Services staff to follow FCI Sandstone policies and standards of care. *Karedla v. Obstetrics & Gynecology Associates, P.A.*, A11-1423, 2012 WL 2077894, at *5 (Minn. Ct. App. June 11, 2012).

Similarly, the Report and Recommendation make much of the timing requested by the surgeon (a material element in this case). In the Defendant's recitation of the facts, they state: "[n]oting that 'no timeline was recommended,' PA Southwick called Dr.l Broadway's office on August 31 'to get a more direct schedule for surgery.'" (Doc. 176 at p. 9). Meanwhile, the Court's Report and Recommendation uses that same language of "no timeline recommended" in its Order without an attribution to the exhibit in which it is drawn from and completely ignores Plaintiff's statement *in the same document* saying "[Dr. Broadway] told me I needed [surgery] soon since it has been 52 days." (Doc. 178-19 at p.1). Plaintiff also corroborated this contemporaneous statement in his deposition. (*See* Mancini Depo at 79:23-80:1).

The omission of key facts from the Plaintiff's evidence and wholesale adoption of the Defendant's presentation directly contravenes the standard on which this motion should have been assessed. When evidence establishes "that material facts remain to be determined in order to conclude whether the non-moving party is entitled to relief,

8

summary judgment should be denied." *Bonomo v. Boeing Co.*, 63 F.4th at 745 (8th Cir. 2023). The Report and Recommendation failed to draw all factual inferences in Plaintiff's favor; if it had, it would be clear the record is replete with material factual disputes rendering summary judgment improper. Moreover, and more importantly perhaps, is the fact that this failure to apply to appropriate standard colors the other determinations of the Court in making this Report and Recommendation.

**II.     Plaintiff Objects to the Finding that Dr. Wyard's Testimony is Inadmissible Pursuant to Federal Rule of Evidence 702.**

Under Rule 702 and *Daubert*, courts have noted that "[o]nly if an expert's opinion is 'so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.'" *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) (quoting *Loudermill v. Dow Chem. Co.,* 863 F.2d 566, 570 (8th Cir.1988)).

The Report and Recommendation indicates that the Court determined that "Dr. Wyard's affidavit contains such factual deficiencies and conclusory speculation as to be properly excluded under Rule 702 and *Daubert*. With respect to the "factual deficiencies," the Court identifies four errors.  Two of those four errors were simple misstatements of dates – hardly anything worthy of the sanction of exclusion. Meanwhile, Plaintiff contends that the other two "errors" the Court identifies – cannot be categorized as such without further exploration and thus, the Report and Recommendation excluding Dr. Wyard's testimony is inaccurate.

For example, the Report and Recommendation states that Dr. Wyard's conclusion that "immediate surgery was needed to avoid permanent damage" is supported

9

"[n]owhwere [in] any healthcare providers report", and "any statements to this effect are absent from Mancini's medical records". (Doc. 189 at 9). This is however, inaccurate. Dr. Wyard's conclusion was not based solely on Plaintiff's testimony that Dr. Broadway told Plaintiff that "if it was up to me [the surgery] would be in a day or two". (*Id.*; *see also* Mancini Depo at 79:23-80:1). Rather, Mr. Mancini's contemporaneous medical records show that on August 31, 2017—following his consultation with Dr. Broadway—Plaintiff told Physician Assistant Jenefer Southwick that Dr. Broadway "told me I needed this soon since it's been 52 days". (USA_000429). Dr. Wyard's opinion that Plaintiff's surgery was urgent *is* therefore supported by the record, as is his ultimate conclusion that the "string of delays resulted in Plaintiff's symptoms worsening significantly," and as a result of the delays "Plaintiff has suffered permanent nerve damage, loss of strength, muscle atrophy, numbness, and pain in his anterior shoulder, tricep, hand, and finger." (Wyard Opinion at ¶¶ 14-15).

      Similarly, the Court holds "Dr. Wyard incorrectly states that Mancini's MRI showed spinal cord compression." Doc. 189 at 8. However, while the Court notes that another document states that "[n]o cord compression or abnormal cord signal" was observed in the MRI (Doc. 178-9), there was no deposition of Dr. Wyard to explore whether this was an error or whether there was something that he noticed that, based on his years of experience as an orthopedic surgeon. Defendant chose not to seek further information about this statement from Dr. Wyard. But now they seek to submit their non-expert opinion on whether a statement in his report was an error or not. For the Court to

10

accept the Defendant's suggestion and summarily conclude this was an "error" – and then to impose the ultimate sanction of exclusion is inappropriate.

Next, the Report and Recommendation turns to the second prong: its determination that Dr. Wyard' expert report fails to describe the standard of care or explain how Defendant deviated from that standard of care. (Dkt. 189 at 10). But this determination is not accurate. Wyard's opinion sets forth facts and data upon which he relies to state his opinion that Defendant's undue delays in providing Plaintiff with his ACDF surgery caused Plaintiff's permanent injuries. For example, Dr. Wyard's Report indicates that FCI Sandstone Health Services had a clear standard of care as set out in their written policies: patients to undergo surgery are placed on nothing-by-mouth (NPO) status and isolated in the Special Housing Unit (SHU) to ensure that this policy is followed. (*See* Wyard Opinion at ¶ 11). Dr. Wyard's Report further states that Plaintiff's ACDF was critically delayed because he was not put on NPO status, "contrary to Health Services Policy". (*Id.*). He then concludes that "failure and resulting delay was a further deviation from the preoperative standard of care." (*Id.* at ¶ 12).

Dr. Wyard meets the factual foundation admissibility standard set forth above because his opinions proffer facts and data upon which he relies, he explains the basis for his opinions, and Dr. Wyard's opinions are supported by the evidence. As such, Dr. Wyard's opinions would be helpful to a factfinder. The "factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs.,*

*Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001). It is therefore for the factfinder to decide whether Dr. Wyard's opinions are sound.

### III. Plaintiff Objects to the Finding the Dr. Wyard's Opinion Fails to Meet the Statutory Standards Set Out in Minn. Stat. § 145.682.

Minn. Stat. § 145.682 "is designed to encourage parties to bring motions to dismiss early in the proceedings in order to eliminate frivolous lawsuits or to give the plaintiff an opportunity to cure any defects prior to trial." *Maudsley v. Pederson,* 676 N.W.2d 8, 12 (Minn. Ct. App. 2004). The "primary objective of the law is to dispose of the case on the merits." *Sorenson v. St. Paul Ramsey Medical Center,* 457 N.W.3d 188, 192 (Minn. 1990). An affidavit under Minn. Stat. § 145.682 must "(1) disclose specific details concerning the expert's expected testimony, including the applicable standard of care, (2) identify the acts or omissions that the plaintiff alleges violated the standard of care, and (3) include an outline of the chain of causation between the violation of the standard of care and the plaintiff's damages." *Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 428 (Minn. 2002).

The Report and Recommendation states that Dr. Wyard's affidavit "does not include any details regarding the applicable standard of care and fails to outline a chain of causation between Defendant's actions and Mancini's injury." (Dkt. 189 at 12). As these alleged deficiencies are discussed in the section above, Plaintiff will not repeat those arguments here.

However, to exclude Plaintiff's expert and thus dismiss Plaintiff's case on the grounds of failing to meet the relatively low standard of Minn. Stat. § 145.682 would be against

the spirit of the law. "[T]he sanction imposed by section 145.682 is the abrupt termination with prejudice of what may be a meritorious cause of action, a sanction in sharp contrast with the judiciary's traditional preference for the disposition of claims on their merits and a corresponding reluctance to require the parties to run a technical obstacle course." *Sorenson v. St. Paul Ramsel Med. Ctr.,* 457 N.W.2d 188, 193 (Minn.1990). Rather than impose this harsh sanction, the Court should strive to dispose of this case on its merits.

**IV.  Plaintiff Objects to the Court's Failure to Consider the Alternate Curing Option of Ordering Defendant to Depose Dr. Wyard.**

In accordance with the purpose of Minn. Stat. § 145.682, Plaintiff included in his Brief in Opposition to Defendant's Motion for Summary Judgment the request for an alternate curative measure. Rather than dismissing his case based on procedural deficiency, Plaintiff requested that this Court consider the less drastic alternative of ordering Defendant to depose Dr. Wyard.

"In borderline cases where counsel for plaintiff identifies the experts who will testify and give some meaningful disclosure of what the testimony will be, there may be less drastic alternatives to a procedural dismissal." *Id.* The District of Minnesota cited *Sorenson* favorably and found that "less severe sanctions, should be utilized if there is a colorable case to be made but there needs to be further 'fleshing out' of the details of the expert's opinions." *Moore v. Freeman,* No. C1-02-603413, 2003 WL 23737251, at *4 (D. Minn. Aug. 21, 2003); *see also House v. Kelbel,* 105 F. Supp. 2d 1045, 1053 (D. Minn. 2000) ("However, in situations in which an affidavit is submitted in good faith, but is not deemed substantively sufficient, the Court has left an opening in which the court can take

13

an alternative action to mandatory dismissal and allow a case to proceed on its merits."). In *Moore,* the court found neither dismissal nor summary judgment appropriate because even though the negligence, causation, and injury were presented as "very straightforward" and "uncomplicated," it did not leave the defendant guessing at plaintiff's theory of the case. *See Moore,* 2013 WL 23737351, at *4.

In this case, Plaintiff's claim and the opinions set forth in Dr. Wyard's affidavit are simple and straight forward, and it is abundantly clear what Plaintiff's theory of the case is. The expert affidavit statute is "intended to provide an avenue for discovery of the evidentiary basis for this action." *Sorenson,* 457 N.W.2d at 193. The Parties have been litigating this claim for years, including full fact discovery, depositions, and expert discovery, the evidentiary basis of the claim is apparent. If the Court has concerns about the evidentiary basis for Dr. Wyard's opinions, the Court should order a deposition of Dr. Wyard rather than simply dismissing Plaintiff's case in its entirety. *See id.* The Report and Recommendation failed to even consider this alternative measure. If this Court indeed finds Dr. Wyard's affidavit legally deficient, the Court should proceed with an alternative route rather than dismissal with prejudice in order to fully effectuate the purpose of § 145.682 and the goals of the judiciary.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court set aside the Report and Recommendation and deny Defendant's Motion for Summary Judgment.

| | |
|---|---|
| Dated:  December 1, 2023 | Respectfully submitted, |
| | _s/Frances Mahoney-Mosedale_ |
| | Daniel E. Gustafson (#202241) |
| | Frances Mahoney Mosedale (#402741) |
| | **GUSTAFSON GLUEK PLLC** |
| | Canadian Pacific Plaza |
| | 120 South 6th Street, Suite 2600 |
| | Minneapolis, MN 55402 |
| | Telephone: (612) 333-8844 |
| | Facsimile: (612) 339-6622 |
| | dgustafson@gustafsongluek.com |
| | fmahoneymosedale@gustafsongluek.com |
| | |
| | ***Attorneys for Plaintiff*** |